**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW LONG, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 2358 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., GHALIAH OBAISI as | ) | |
| Independent Executor of the Estate of | ) | |
| DR. SALEH OBAISI, and DONALD | ) | |
| MILLS, | ) | |
| Defendants. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Andrew Long, an inmate at Stateville Correctional Center ("Stateville"), suffers from keratoconus, an eye condition in which the cornea bulges outward into a cone shape, impairing vision. In this action, Mr. Long alleges a violation of his Eighth Amendment rights. Pursuant to 42 U.S.C. § 1983, Mr. Long sues Wexford Health Sources, Inc. ("Wexford"), Stateville's medical provider, Dr. Saleh Obaisi, Stateville's former medical director, and Donald Mills, Stateville's former healthcare unit administrator, for deliberate indifference to a serious medical need by delaying treatment for his keratoconus. The defendants moved for summary judgment prior to expert discovery, with leave of the Court. ECF No. 85. For the reasons discussed below, the Court grants Mr. Mills' motion for summary judgment, ECF No. 98, and the Court grants in part and denies in part Wexford and Dr. Obaisi's motion for summary judgment, ECF No. 94. The Court grants Wexford and Dr. Obaisi's motion as to Mr. Long's request for punitive damages against Dr. Obaisi's estate. Their motion is otherwise denied.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Where the facts are disputed, the Court views the facts in the light most favorable to the nonmoving party—in this case, Andrew Long. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

Mr. Long has been incarcerated within the Illinois Department of Corrections ("IDOC") since 2009. Pl.'s Resp. to Wexford Defs.' Statement of Facts ("PRWSF") ¶ 1, ECF No. 109. Mr. Long's claims in this case are based on allegedly deficient medical care he received while he was an inmate at Stateville.

Wexford provides healthcare services to inmates at IDOC prisons, including Stateville, pursuant to a contract with the State of Illinois. Defs.' Joint Resp. to Pl.'s Statement of Additional Facts ("DRSAF") ¶ 1, ECF No. 121. The physicians, physician's assistants, and nurses in the healthcare unit at Stateville are Wexford employees. DRSAF ¶ 1. Wexford employed defendant Dr. Saleh Obaisi as the medical director at Stateville until his death on December 23, 2017. PRWSF ¶ 2. Ghaliah Obaisi (Dr. Obaisi's widow) is the administrator of Dr. Obaisi's estate. As the medical director, Dr. Obaisi saw patients and performed administrative duties, including participating in the process for approving offsite care. DRSAF ¶ 4. During the relevant period, Wexford also employed optometrists Dr. George Nista and Dr. Timothy J. Fahy. Dr. Nista provided onsite optometry care at Stateville from March 30, 2015, to February 8, 2016, and Dr. Fahy has filled that role since October 2016. *Id.* at ¶¶ 2, 15. Wexford does not provide onsite ophthalmologists at Stateville. *Id.* at ¶ 3. Inmates needing medical care not offered at Stateville must travel offsite. For an inmate to see an offsite provider in a nonemergency, an onsite provider must refer the inmate offsite, and Wexford must approve the referral. *Id.*

Defendant Donald Mills was the healthcare unit administrator at Stateville from June 2016 until September 2018. Pl.'s Resp. to Donald Mills' Statement of Material Fact ("PRMSF") ¶ 2,

ECF No. 110. Mr. Mills was directly employed by the IDOC and, as the healthcare unit administrator, was the IDOC employee responsible for overseeing the unit's operation and activities. DRSAF ¶ 5. He reviewed inmate grievances related to the healthcare unit and wrote or approved responses. *Id*. at ¶ 6. Mr. Mills also participated in monthly meetings with Stateville's governing bodies; at these meetings, participants discussed issues including individual inmates' medical care. *Id*. The parties dispute Mr. Mills' role, if any, in approving offsite medical care for inmates at Stateville. PRMSF ¶ 24; DRSAF ¶ 5.

The relevant period for Mr. Long's claims begins on March 31, 2015, when Mr. Long injured his right eye playing basketball. DRSAF ¶ 7. Following this injury, a physician's assistant in the healthcare unit referred Mr. Long to Dr. Nista for an evaluation. *Id*. at ¶ 8. Mr. Long saw Dr. Nista on April 6, 2015; during this visit, Dr. Nista measured Mr. Long's uncorrected visual acuity as 20/50 in his right eye and 20/200 in his left eye, meaning worse vision in his left eye. *Id*. at ¶ 9. Dr. Nista recommended a follow-up to reevaluate Mr. Long's right-eye injury and for an eye exam due to Mr. Long's poor vision. *Id*.

Mr. Long returned to see Dr. Nista on July 20, 2015. DRSAF ¶ 10. At this visit, Dr. Nista measured Mr. Long's uncorrected visual acuity as 20/60 in his right eye and 20/200 in his left eye, and Mr. Long's best corrected visual acuity (*i.e.*, the best vision achievable with prescription glasses) as 20/25 in his right eye and 20/50 in his left eye. *Id*.; Group Ex. to Mills Dep., Stateville 275, ECF No. 100 Ex. C. In addition, Dr. Nista measured the curvature of Mr. Long's cornea using a keratometer, finding normal curvature in Mr. Long's right eye but abnormal curvature in his left eye. DRSAF ¶ 10. The poor vision in Mr. Long's left eye and its abnormal curvature caused Dr. Nista to suspect that Mr. Long suffered from keratoconus. Dr. Nista prescribed eyeglasses as an immediate measure and recommended that Mr. Long return for further evaluation in six weeks. *Id*.

at ¶¶ 11-12. Mr. Long received new eyeglasses on September 9, 2015. *Id*. at ¶ 14. However, Mr. Long immediately complained that they did not enable him to see clearly out of his left eye. *Id*. In addition, Mr. Long never returned for a follow-up visit with Dr. Nista before Dr. Nista left his Stateville position on February 8, 2016.

Dr. Obaisi treated Mr. Long for a right-eye injury caused by a spider bite one week after Dr. Nista left Stateville, on February 16, 2016. *Id*. at ¶ 18. During this visit, Mr. Long alerted Dr. Obaisi to his left-eye condition. *Id*. In the note documenting Mr. Long's visit, Dr. Obaisi recommended that Mr. Long see an optometrist for evaluation of his left eye.[1]

Despite Dr. Nista's July 2015 and Dr. Obaisi's February 2016 recommendations, Mr. Long did not see an optometrist until December 28, 2016. DRSAF ¶ 14. Mr. Long alleges that, during this approximately seventeen-month waiting period, he sent letters to Dr. Obaisi and Mr. Mills and filed a grievance on December 20, 2016, describing his symptoms and requesting treatment. *Id*. at ¶ 16. Mr. Long points to copies of three letters addressed to Mr. Mills that Mr. Long attached to his *pro se* complaint, which are the only letters Mr. Long alleges sending to Mr. Mills. Compl. 25-27, ECF No. 1; PRMSF ¶ 30. One of these letters is dated during the waiting period (the date on this letter is July 29, 2016). Compl. 25. The defendants state that they never received Mr. Long's letters, and Mr. Mills does not recall reading Mr. Long's grievance. DRSAF ¶ 16. Mr. Long also alleges that he spoke directly with Mr. Mills about needing treatment. *Id*. at ¶ 17. The defendants

---

[1] The Wexford defendants wrote in their memorandum in support of their motion for summary judgment and reply brief that Dr. Obaisi referred Mr. Long to an optometrist "for an evaluation of his **right** eye." Wexford Defs.' Mem. Supp. Summ. J. 6, ECF No. 95; Wexford Defs.' Reply Br. 6, ECF No. 123 (emphasis added). However, the defendants do not dispute Mr. Long's statement that the referral was in fact for an evaluation of his **left** eye. DRSAF ¶ 18. The Court assumes that the Wexford defendants' continued reference to Mr. Long's right eye in their reply brief was inadvertent. Regardless, Mr. Long's medical record indicates that the referral was for his left eye. Group Ex. to Mills Dep., Stateville 175.

do not dispute that Mr. Long had three in-person conversations with Mr. Mills regarding his eye treatment, with two of them before his December 2016 visit with Dr. Fahy. PRMSF ¶¶ 18-21; DRSAF ¶ 17. The defendants do, however, dispute some of the content of Mr. Mills' conversations with Mr. Long. DRSAF ¶ 17.

With Dr. Nista's departure in February 2016, Stateville lacked an available onsite optometrist until October 2016, when Dr. Fahy filled the position. *Id*. at ¶ 15. In one of Mr. Long's conversations with Mr. Mills about his eye treatment, during the period without an onsite optometrist, Mr. Mills told Mr. Long that he was on a waitlist for an appointment with Stateville's as-yet-to-be-hired onsite optometrist and would have to wait for onsite appointments to become available before he could see an optometrist. *Id*. at ¶ 17. When Dr. Fahy began work at Stateville, more than 500 inmates were waiting for an optometry appointment, according to Dr. Fahy's testimony. *Id*. at ¶ 15. At that time, Stateville's population comprised approximately 3,300 inmates. *See* Ill. Dep't Corrs., *Quarterly Report* tbl.1 (Oct. 1, 2016).

On December 28, 2016, Mr. Long was seen by Dr. Fahy. DRSAF ¶ 20. At this visit, Dr. Fahy measured Mr. Long's uncorrected visual acuity as 20/400 in his left eye. Mr. Long's left eye was too distorted for Dr. Fahy to get a keratometer reading. Dr. Fahy concluded that Mr. Long likely suffered from keratoconus and referred Mr. Long to the University of Illinois's Cornea Clinic to confirm the diagnosis and for further evaluation. *Id*. at ¶ 20. He marked the referral as "urgent" to help Mr. Long receive faster care, given the backlog of optometry patients at the time. *Id*. at ¶ 21. Wexford approved the referral on January 5, 2017. *Id*. at ¶ 22; Group Ex. to Mills Dep., Stateville 216. Mr. Long saw offsite ophthalmologist Dr. Hreem Patel on January 10, 2017, and Dr. Patel confirmed a keratoconus diagnosis. DRSAF ¶ 22.

Keratoconus is a progressive corneal disease in which the cornea thins in the center, causing the cornea to bulge outward into a cone shape, which distorts a person's vision. PRWSF ¶ 12. As Mr. Long describes his condition, "my left eye is bulging out like a[n] ice cream cone." Compl. 37. Mr. Long testified that his keratoconus has caused him pain, blurred vision, light halos, and migraines. DRSAF ¶ 19. Since his diagnosis, Mr. Long has received new eyeglasses and rigid gas permeable ("RGP") contact lenses to correct his vision and for eye protection, ketorolac eye drops and Tramadol for eye pain, and artificial tears and ketotifen antihistamine for itching. PRWSF ¶¶ 43-73; DRSAF ¶¶ 25-28.

Mr. Long's medical records show declining vision in his left eye after his visits with Dr. Nista. Mr. Long's left-eye best corrected visual acuity (*i.e.*, the best vision achievable with eyeglasses) declined from 20/50 in July 2015 (the date of his last visit with Dr. Nista) to 20/80 in March 2017 and 20/200 in July 2017. Group Ex. to Mills Dep., Stateville 275, 282, 287. In 2019, offsite optometrist Dr. Alexandra Piper determined that Mr. Long was not a candidate for corneal collagen cross-linking, a treatment that can slow the progression of keratoconus, because of the advanced stage of his disease. DRSAF ¶¶ 31, 35; PRWSF ¶¶ 67-68. The parties dispute whether Mr. Long's symptoms were consistent with early-stage keratoconus in July 2015 and, relatedly, whether Mr. Long would have been a candidate for corneal collagen cross-linking absent waiting seventeen months for his next optometry appointment. DRSAF ¶¶ 33, 35.

## DISCUSSION

At the summary judgment stage, the Court determines whether a genuine dispute of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). As the nonmoving party, Mr. Long bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021-22 (7th Cir. 2018). The Court must examine

the record in the light most favorable to Mr. Long, "resolving all evidentiary conflicts and drawing all reasonable inferences in his favor." *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015).

Mr. Long brings an Eighth Amendment claim based on deficient medical care for his keratoconus. The Eighth Amendment obliges the government "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]eliberate indifference to the serious medical needs of prisoners constitutes the 'unnecessary and wonton infliction of pain,'" which violates the Eighth Amendment right to be free from cruel and unusual punishment. *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Accordingly, 42 U.S.C. § 1983 enables prisoners to sue prison officials who act with deliberate indifference to their serious medical needs. In addition, entities providing prison medical care may be held liable under § 1983 for maintaining a policy or custom reflecting deliberate indifference to prisoners' medical needs. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 n.1 (7th Cir. 2004).

A successful deliberate indifference claim is comprised of an objective element, a subjective element, and an injury. First, an inmate must demonstrate that his medical need was objectively sufficiently serious. "Second, an inmate must establish that prison officials acted with a 'sufficiently culpable state of mind' to support liability." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). These objective and subjective elements comprise the constitutional violation. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Finally, because § 1983 "creates a species of tort liability," a successful plaintiff "must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." *Roe*, 631 F.3d at 863-64 (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)).

Applying these principles here means that for Mr. Long to survive summary judgment, he must provide evidence (1) that his keratoconus constitutes an objectively serious medical condition, (2) that the defendants were deliberately indifferent to his need for treatment, and (3) that deficient treatment harmed him. The defendants do not dispute that Mr. Long's keratoconus meets the objective requirement of a serious medical condition. Thus, the Court finds that element conceded.[2] In his summary judgment briefing, Mr. Long's arguments are based on the defendants' responsibility for the delay in his keratoconus treatment between July 2015 and December 2016, so the Court does not consider other potential bases for liability. *See generally* Pl.'s Resp. Opp. to Defs.' Mots. Summ. J., ECF No. 108. The Wexford defendants call the delay at the root of Mr. Long's claim "alleged" in their briefing. Wexford Defs.' Mem. Supp. Summ. J. 7; Wexford Defs.' Reply Br. 8. However, they admit that Mr. Long did not see an optometrist or ophthalmologist for seventeen months, from July 2015 to December 2016. DRSAF ¶ 13. They also admit that he received no evaluation or treatment for keratoconus during this period, aside from delivery of eyeglasses prescribed by Dr. Nista (that allegedly did not correct his vision). *Id*. at ¶ 14. Therefore, the Court finds the delay in Mr. Long's treatment beyond dispute. Based on the above, the Court considers only whether the defendants were deliberately indifferent to Mr. Long's medical needs by delaying his treatment between July 2015 and December 2016 and whether the seventeen-month delay in Mr. Long's treatment caused him harm.

---

[2] For completeness, the Court notes that several courts in the Seventh Circuit have found keratoconus to qualify as a serious medical condition on preliminary review pursuant to 28 U.S.C. § 1915A. *See Nunez v. Spiller*, No. 15-CV-00514, 2015 WL 3419513, at *2 (S.D. Ill. May 28, 2015); *Marshall v. Nickel*, No. 06-C-617, 2007 WL 5582139, at *5 (W.D. Wis. Jan. 29, 2007).

A. **Causation**

Mr. Long bases his claim of a constitutional violation on a seventeen-month delay in his keratoconus treatment, specifically the period between Mr. Long's visit with Dr. Nista in July 2015 and his next visit with an optometrist in December 2016. "In cases where prison officials delayed rather than denied medical assistance to an inmate," the plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (quoting *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007)). Mr. Long alleges harm first in his pain and suffering during the delay and, second, in the progression of his keratoconus during the delay to the point where he became ineligible for corneal collagen cross-linking, a treatment that can slow the progression of keratoconus. Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 13-15. The Wexford defendants argue that Mr. Long has not offered "verifying medical evidence" that any harm he has suffered is attributable to delayed treatment rather than to his underlying condition, keratoconus. Wexford Defs.' Mem. Supp. Summ. J. 7-12; Wexford Defs.' Reply Br. 8-9.

Mr. Long testified at his deposition that his keratoconus has caused him worsening vision, blurred vision, light halos, eye pain, and migraines. DRSAF ¶ 19. He did not specify whether he experienced these symptoms during the delay period, but his medical records show that he experienced at least one of these symptoms, worsening vision, during the delay period: his uncorrected left-eye visual acuity deteriorated from 20/200 in July 2015 to 20/400 in December 2016. *Id*. at ¶ 20. A reasonable jury could find from his testimony and his medical records that he experienced these symptoms during the delay period.

The record also includes evidence that available treatments could have alleviated at least some of these symptoms during the July 2015 to December 2016 period. After his keratoconus diagnosis, Mr. Long saw several optometrists and ophthalmologists who prescribed treatments for

his symptoms, and the record shows that those treatments worked. For instance, Mr. Long received new glasses and, later, RGP contact lenses to treat his poor vision.[3] *See* Group Ex. to Mills Dep., Stateville 244-46, 281, 295. With RGP contact lenses, Mr. Long's left-eye vision improved "[d]rastically" to 20/30, which is considered a functional level, *i.e.*, the level required to drive. Fahy Dep. 110:11, ECF No. 96 Ex. 9; Group Ex. to Mills Dep., Stateville 297; Piper Dep. 50:6-10, ECF No. 96 Ex. 6 (explaining that driving level is 20/15 to 20/70 in Illinois). RGP contact lenses are also used to treat visual disturbances, such as blurred vision and light halos. *See* Piper Dep. 25:2-17; Fahy Dep. 61:16-62:6 (explaining that the contact lenses create a new surface for the cornea that corrects irregularities). In response to Mr. Long's complaints of eye pain, he received prescriptions for ketorolac eye drops and Tramadol. PRWSF ¶¶ 49, 61. Mr. Long testified at his deposition that Tramadol helps relieve his eye pain. *Id*. at ¶ 76.

In sum, Mr. Long has testified to his symptoms, which he is competent to do. His medical records provide further evidence that he experienced worsening vision and eye pain during the relevant period. His testimony and medical records also provide evidence that these symptoms were avoidable. This evidence is sufficient for a jury to find for Mr. Long on his first theory of harm. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (explaining that a non-trivial delay in treating serious, avoidable symptoms is enough to show harm).

Mr. Long also alleges that, absent the delay in his treatment, he would have been a candidate for corneal collagen cross-linking. Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 13-15.

---

[3] Mr. Long notes in the fact section of his response brief that it took until 2019 for him to receive RGP contact lenses. Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 4. The Court does not address whether any delay in receiving contact lenses could support a deliberate indifference claim because Mr. Long does not make this argument in his response brief; his arguments for defeating summary judgment all relate to the seventeen-month delay in his keratoconus treatment from July 2015 through December 2016. The important point here is that his worsening vision during that seventeen-month period could have been alleviated with contact lenses.

Evidence from Mr. Long's medical records shows that his uncorrected left-eye visual acuity deteriorated from 20/200 in July 2015 to 20/400 in December 2016. DRSAF ¶ 20. By the time Mr. Long saw optometrist Dr. Piper in 2019, he was an "unlikely candidate for cross-linking" due to the advanced stage of his keratoconus. Group Ex. to Mills Dep., Stateville 243. Missing from the evidence, however, is expert medical testimony that Mr. Long would have been a candidate for corneal collagen cross-linking between July 2015 and December 2016, the delay period. Expert testimony to this effect would significantly strengthen Mr. Long's causal argument. However, the Seventh Circuit has "determined that 'causation is normally a matter for the jury.'" *Conley*, 796 F.3d at 749 (quoting *Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 640 (7th Cir. 1982)). A successful deliberate indifference claim does not require expert medical testimony. *See Roe*, 631 F.3d at 865 (affirming a jury verdict for a plaintiff who did not introduce testimony from a medical expert). More importantly for this case, Mr. Long has not yet had the opportunity to seek expert testimony because the defendants moved for summary judgment prior to expert discovery. Mr. Long has offered sufficient evidence on his second theory of harm that the Court cannot conclude as a matter of law that expert discovery would be futile to showing harm.

Mr. Long has raised a dispute of material fact about whether the treatment delay at issue caused him harm. His testimony and medical records provide sufficient evidence for a reasonable jury to conclude that treatment delay caused him serious but avoidable eye pain and poor vision. In addition, Mr. Long's evidence that the delay denied him the opportunity to benefit from corneal collagen cross-linking, which could have slowed the progression of his keratoconus, justifies expert discovery, so long as Mr. Long has also raised a fact issue on whether the defendants acted with deliberate indifference.

### B.  Deliberate Indifference

Deliberate indifference is "a 'subjective state of mind' somewhere between negligence and intention." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). The standard is "akin to recklessness," though objective recklessness is insufficient. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). To show deliberate indifference, "a plaintiff must provide evidence that [a defendant] *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728.

Section 1983 only provides for personal liability; a defendant cannot be held liable under a theory of supervisory liability. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). As a result, Mr. Long must provide sufficient evidence for a reasonable jury to find that each defendant acted with deliberate inference. Mr. Long alleges the following about each defendant:

- Wexford maintained policies of (1) refusing offsite eye care visits in the absence of an onsite optometrist, while failing to hire an onsite optometrist; and (2) denying treatment for eye conditions until those conditions became health crises;

- Dr. Obaisi failed to ensure that Mr. Long received an optometry appointment after referring Mr. Long to an optometrist in February 2016; and

- Mr. Mills failed to help Mr. Long secure an optometry appointment.

The Court considers the arguments with respect to each defendant in turn.

### 1.  Wexford

Mr. Long names Wexford, the private contractor that provides medical care at Stateville, as a defendant. Corporations that contract to provide essential government services are subject to the same rules as public entities under § 1983. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017); *Woodward*, 368 F.3d at 927 n.1. Like their public counterparts, private contractors are not subject to *respondeat superior* liability. *Glisson*, 849 F.3d at 378-79;

*Woodward*, 368 F.3d at 927 n.1. To be liable, Wexford must have "maintained an unconstitutional policy or custom" giving rise to personal liability. *Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015). The policy or custom must be "the 'direct cause' of or 'moving force' behind [the plaintiff's] constitutional injury." *Pyles*, 771 F.3d at 409-10 (quoting *Minix v. Carnarecci*, 597 F.3d 824, 832 (7th Cir. 2010)). Thus, for Mr. Long to have a viable claim of deliberate indifference against Wexford, he "must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

Mr. Long could take a direct or an indirect route to showing a Wexford policy. *See Est. of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530-31 (7th Cir. 2000). Taking the direct route, Mr. Long could provide evidence of an explicit policy. This route is available where the appropriate entity (here, Wexford) "promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 417 (1997) (Souter, J., dissenting)). Alternatively, in the absence of an explicit policy, Mr. Long could take an indirect route by providing evidence of "a series of bad acts that together raise the inference of such a policy." *Shields*, 746 F.3d at 796. The inference requires more than "one or two missteps" but rather "systemic and gross deficiencies." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). The inferred policy or custom could arise from a series of affirmative acts or from sustained inaction when the need to act is sufficiently obvious (two different types of indirect routes). *See Natale*, 318 F.3d at 584.

The Wexford defendants argue that Mr. Long's claim is nonviable because he alleges a *respondeat superior* theory. Wexford Defs.' Mem. Supp. Summ. J. 13. They cite Mr. Long's

deposition testimony that he sued Wexford because of Dr. Obaisi's misconduct and to obtain specific treatments for his eyes.[4] *Id*. To the extent that Mr. Long argues for *respondeat superior* liability, his argument would be frivolous. However, Mr. Long's response to the Wexford defendants' motion for summary judgment alleges two policy theories (and disclaims a *respondeat superior* theory). Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 17-21. The Wexford defendants' reply brief still cites Mr. Long's deposition testimony and inexplicably fails to acknowledge the policy arguments advanced in his response brief. Wexford Defs.' Reply Br. 9. Having read the summary judgment briefing, the Court proceeds to determine whether a dispute of material fact exists as to whether Wexford maintained an unconstitutional policy.

Mr. Long alleges that Wexford maintained two policies reflecting deliberate indifference to inmates' medical needs. First, he alleges that Wexford maintained a policy of "refusing off-site optometrist visits when Wexford failed to make an on-site optometrist available, regardless of the inmates' eye condition." Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 17-18. Second, Mr. Long alleges that Wexford maintained a policy of "delaying diagnosis or refusing appropriate medical treatment for inmates' serious eye health conditions—including [Mr. Long's] keratoconus—until those conditions are an emergency or at an advanced stage," or limiting eye care to a "health crisis." *Id.* at 18-19. Mr. Long alleges that both policies delayed his keratoconus treatment, the injury at the base of his § 1983 claim. At this stage, the Court must determine whether a reasonable jury could find that Wexford maintained these policies, that they are deliberately indifferent to inmates' medical needs, and that they delayed Mr. Long's care.

---

[4] Wexford asked, "Am I correct . . . that you sued Wexford for the improper conduct of Dr. Obaisi?" Mr. Long replied, "Correct." When asked for any other reasons, Mr. Long added that he sought collagen treatment and surgery. Long Dep. 21:13-24, ECF No. 96 Ex. 1.

The Wexford defendants argue that Mr. Long's evidence is insufficient to raise a triable issue of fact on a policy or custom theory because his evidence is limited to his own experience. Wexford Defs.' Mem. Supp. Summ. J. 13. The Court disagrees with the Wexford defendants on Mr. Long's first policy theory (about refusing offsite optometry visits). Mr. Long's evidence on his first theory is not limited to his personal experience of failing to receive an optometry appointment during the period when Stateville lacked an onsite optometrist. Mr. Long provides evidence of other inmates' lack of access to offsite eye care in the form of Dr. Nista's testimony that when he began working at Stateville, more than 500 inmates were on a waitlist for optometry care because Stateville had not had an onsite optometrist for "some period of time." DRSAF ¶ 15. In addition, Dr. Neil Fisher's testimony and Mr. Mills' statements support the existence of a Wexford policy regarding offsite referrals. Dr. Fisher, Wexford's corporate medical director of quality and pharmacy, testified that Wexford maintains a formal, centralized process for approving nonemergency offsite care that requires a referral from a clinician followed by collegial review. Fisher Dep. 28:21-33:6, ECF. No. 96 Ex. 8. Dr. Fisher did not testify about the process for inmates to obtain the required referral, and the record does not include other direct evidence regarding this aspect of Wexford's offsite care policy (*e.g.*, a policy manual). However, in a conversation between Mr. Long and Mr. Mills during the period when Stateville lacked an onsite optometrist, Mr. Mills told Mr. Long that he could not receive an optometry appointment until Wexford hired an onsite optometrist.[5] DRSAF ¶ 17. In other words, Mr. Mills offered no path for Mr. Long to receive an offsite referral and appointment in the absence of an onsite optometrist, which provides

---

[5] Mr. Mills' statement is arguably hearsay as used by Mr. Long against Wexford. However, all defendants admitted to the statement, and the Wexford defendants did not make a hearsay objection. Therefore, the Court considers the statement.

some evidence that inmates must see an onsite optometrist to obtain an offsite optometry referral under Wexford's offsite care policy.

In sum, Mr. Long offers evidence to support his first policy theory in the form of the experiences of 500 other inmates and statements by administrators, as well as his own experiences. This evidence leaves significant gaps, especially as to the form of Wexford's offsite care policy as it relates to referrals, but the evidence is sufficient for a reasonable jury to find that Wexford had the offsite care policy Mr. Long describes, that this policy is deliberately indifferent to inmates' medical needs, and that it caused Mr. Long's injury. As follows, the Court walks through each of these prongs of Mr. Long's burden with respect to his first policy theory (the offsite care policy). Then, the Court turns to Mr. Long's second policy theory.

In his response brief, Mr. Long is vague about the form that Wexford's offsite care policy takes. As previously stated, he alleges that Wexford had a policy of "refusing off-site optometrist visits when Wexford failed to make an on-site optometrist available, regardless of the inmates' eye condition." Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 17-18; s*ee also id*. at 18 (alleging that Wexford had a policy of "withholding off-site medical visits from inmates unless [those] inmate[s] receive[] a referral from an on-site specialist within the same field"); PRMSF ¶ 22 (Mr. Long admitting to Mr. Mills' statement of fact that "Stateville Correctional Center only sends inmates to be seen by off-site optometrists if the on-site optometrist makes a recommendation for specific inmates to receive off-site treatment or assessment"). Viewing the evidence in the light most favorable to Mr. Long, the Court finds that a reasonable jury could find that Wexford's offsite care policy took one of three forms: (1) an explicit policy that only authorized the onsite optometrist to make offsite optometry referrals, even in the absence of an onsite optometrist; (2) if nonoptometrists had authority to make offsite optometry referrals, a conscious failure to vest

responsibility in anyone to make those referrals when the onsite optometrist position was vacant; or (3) if someone at Stateville had that responsibility, a conscious failure to intervene when the responsible person let inmates languish on a waitlist for nonexistent onsite appointments.

First, the evidence is sufficient to establish the existence of a Wexford offsite care policy via the direct route (*i.e.*, an explicit policy). Dr. Fisher's deposition testimony and Mr. Mills' oral statement to Mr. Long, corroborated by the 500-inmate waitlist described by Dr. Fahy, support the proposition that Wexford promulgated a generally applicable offsite care policy that required inmates to obtain offsite optometry referrals from an onsite optometrist to receive approval for an appointment with an offsite optometrist. To be sure, a jury could find that Wexford never had such a policy. Wexford asserts that "[e]ach Wexford clinician is expected to utilize their independent medical judgment in providing medical care." Wexford Defs.' Mem. Supp. Summ. J. 13. Dr. Fisher testified that inmates have received offsite care outside of Wexford's formal process, suggesting that there might be some flexibility in Wexford's offsite care policy to account for special circumstances. Fisher Dep. 30:4-9. The record does not include a Wexford policy manual or other statement that says who has authority to provide offsite referrals in what circumstances. But Mr. Long has done enough to raise an issue of material fact about whether Wexford had an explicit offsite care policy with the content he alleges.

Mr. Long could also establish that Wexford maintained the offsite care policy he describes via an indirect route (*i.e.*, by showing a series of bad acts that raise the inference of a policy, even if Wexford did not promulgate the policy explicitly). The experiences of more than 500 inmates waiting for nonexistent optometry appointments is evidence of more than "one or two missteps," *Hildreth*, 960 F.3d at 426; this evidence is sufficient for a reasonable jury to infer a nonexplicit policy of "refusing off-site optometrist visits when Wexford failed to make an on-site optometrist

17

available, regardless of the inmates' eye condition." Rather than finding that Wexford maintained an explicit policy of requiring referrals from onsite optometrists for an inmate to see an offsite optometrist, a jury could infer simply that Wexford consciously failed to vest responsibility in someone to redirect inmates to an offsite optometrist in the absence of an onsite optometrist—the second policy form described above. *See, e.g., Glisson,* 849 F.3d at 379-81 (holding that a jury could reasonably find that a prison healthcare provider's failure to vest responsibility in anyone for coordinating complex care constituted a policy for the purposes of § 1983 liability). Alternatively, if someone at Stateville had that responsibility (perhaps Dr. Obaisi, as discussed below in the section dedicated to Dr. Obaisi), a reasonable jury could infer that Wexford consciously failed to ensure that the responsible person was doing their job—the third policy form described above. *See, e.g., Woodward*, 368 F.3d at 928 (holding that a reasonable jury could infer a corporate policy where management knew of "employees' disregard for written policies and yet did nothing to ensure that they followed those procedures").

While Mr. Long has provided sufficient evidence that Wexford had a policy of "refusing off-site optometrist visits when Wexford failed to make an on-site optometrist available, regardless of the inmates' eye condition," he still must show that the policy was deliberately indifferent to succeed based on his first policy theory. The Wexford defendants argue that even if Mr. Long could show a Wexford policy, he cannot survive summary judgment because Dr. Obaisi was not deliberately indifferent, so Wexford's policy cannot be deliberately indifferent. Wexford Defs.' Mem. Supp. Summ. J. 14. As explained in the Dr. Obaisi section below, the Court denies summary judgment in favor of Dr. Obaisi. A jury could reasonably find that Dr. Obaisi (or another Wexford employee) was deliberately indifferent and that Wexford did nothing, thereby condoning the conduct (as in *Woodward*). This is the third policy form described above. But even if a jury decided

18

that neither Dr. Obaisi nor any other Wexford agents were deliberately indifferent, an institutional policy could itself be deliberately indifferent to the quality of care provided (as in *Glisson*). *Glisson,* 849 F.3d. at 378-81. A reasonable jury could still find Wexford liable for deliberate indifference if it found that Wexford maintained an offsite care policy in one of the first two forms described above, neither of which requires misconduct by individual medical providers.

A reasonable jury could conclude that Wexford's offsite care policy is itself deliberately indifferent because it "creates a risk that is sufficiently obvious as to constitute deliberate indifference to [ ] inmates' medical needs." *Id.* at 381 (quoting *Natale,* 318 F.3d at 585). The jury could find that because of the high probability that Stateville's onsite specialist positions will be unfilled at some point, the need to establish protocols for sending inmates offsite for medical care in such situations is obvious. The jury could further conclude that Wexford had actual knowledge that, without a protocol for sending optometry patients offsite in the absence of an onsite optometrist, the constitutional rights of inmates would sometimes be violated by delayed care. An inexplicable delay in treatment that serves no penological interest can support a constitutional violation. *See Petties*, 836 F.3d at 730-31 (collecting cases). Next, the jury could conclude that Wexford nonetheless adopted a policy of refusing offsite optometry visits in the absence of an onsite optometrist. Finally, the jury could conclude that Wexford, indifferent to the serious risk arising from delayed care, made a deliberate choice to maintain its problematic policy.

To survive summary judgment based on his first policy theory, Mr. Long's last task is to provide evidence that Wexford's policy of refusing offsite optometry visits in the absence of an onsite optometrist "was the direct cause of or moving force behind" the injury at the base of his § 1983 claim. *Pyles*, 771 F.3d at 409-10 (internal quotation marks omitted). Mr. Long meets this burden. During the relevant period, June 2015 to December 2016, Stateville lacked an onsite

optometrist for nine months, from February to October 2016. When Mr. Long complained to Mr. Mills during the relevant period about not receiving an optometry appointment, Mr. Mills told Mr. Long that he would have to wait until Wexford hired a new onsite optometrist to receive an optometry appointment. Furthermore, in responding to Mr. Long's statement of additional facts, Wexford directly attributed the delay in Mr. Long's care to "hiring issues," meaning Wexford's difficulty filing the optometry position at Stateville after Dr. Nista's departure. DRSAF ¶ 13 ("Defendants dispute that Plaintiff was not *scheduled* to be seen by an optometrist or eye doctor for over seventeen months. Plaintiff was scheduled but due to hiring issues, Plaintiff was not actually seen by an optometrist or eye doctor for seventeenth [sic] months."). This evidence is sufficient for a reasonable jury to draw a causal link between Wexford's offsite care policy and Mr. Long's delayed care: a reasonable jury could conclude that because Wexford refused offsite optometry visits in the absence of an onsite optometrist, Mr. Long was unable to receive any appointment with an optometrist, whether onsite or offsite, during the period when Stateville lacked an onsite optometrist.

While Mr. Long provides sufficient evidence to survive summary judgment based on his first policy theory, Mr. Long provides insufficient evidence for a jury to find that Wexford maintained a policy of limiting eye care to health crises, the policy at the base of his second policy theory. His only evidence of such a policy is that Dr. Fahy marked "urgent" on Mr. Long's first referral to an offsite optometrist. Dr. Fahy testified that he added this notation to help Mr. Long receive faster care given the backlog of patients waiting for eye care in December 2016. DRSAF ¶ 21. Not only is this evidence limited to Mr. Long's personal experience, as Wexford points out, but Mr. Long only offers one example from his experience. Dr. Fahy never marked another of Mr. Long's offsite referrals with the "urgent" notation. This evidence of a Wexford policy is

insufficient to establish a policy because it does not go to show an explicit policy (foreclosing the direct route) and fails to demonstrate the systematic actions or omissions required for a reasonable jury to infer a policy (foreclosing the indirect route). Because Mr. Long has provided insufficient evidence for a reasonable jury to conclude that Wexford maintained a policy of limiting eye care to health crises, the Court does not consider whether Mr. Long has provided sufficient evidence for the jury to conclude that such a policy is deliberately indifferent.

Mr. Long opposes summary judgment on his claims against Wexford based on two alleged Wexford policies, an offsite care policy and a policy of limiting eye care to health crises. For the reasons detailed above, the Court finds sufficient evidence in the record to raise a material dispute about whether Wexford had an offsite care policy with the content alleged by Mr. Long during the relevant period and, if so, whether that policy reflected deliberate indifference and caused the injury at the base of his § 1983 claim. In addition, and more simply, the Court finds that a generic and undeveloped invocation of "hiring issues" to explain an inmate's delayed care is insufficient as a matter of law to rebut a claim of deliberate indifference. Accordingly, the Wexford defendants' motion for summary judgment is denied as to Wexford.

### 2. Dr. Obaisi

Mr. Long also names Dr. Obaisi, Stateville's former medical director, as a defendant. To survive summary judgment, Mr. Long must provide evidence that Dr. Obaisi "knew of a substantial risk of harm to [Mr. Long] and disregarded the risk." *Greeno*, 414 F.3d at 653. Mr. Long can show knowledge through direct or circumstantial evidence. *Petties*, 836 F.3d at 728. The Court considers whether Dr. Obaisi was deliberately indifferent to Mr. Long's medical needs as Mr. Long's treating physician or in his administrative role as Stateville's medical director. To the extent that Mr. Long alleges liability based on a discretionary medical decision by Dr. Obaisi, Mr.

Long needs to provide evidence that Dr. Obaisi departed so substantially from accepted professional standards that his decision was not based on professional judgment. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016). Dr. Obaisi died on December 23, 2017, and as to Long's claim against Dr. Obaisi, the Court considers only the facts relevant to Mr. Long's medical treatment prior to Dr. Obaisi's death.

The first question is whether Mr. Long has raised a triable issue of fact on whether Dr. Obaisi knew of his serious eye condition. The parties do not dispute that when Dr. Obaisi saw Mr. Long on February 16, 2016, he suffered from keratoconus (then undiagnosed). Mr. Long alleges that during the visit, he informed Dr. Obaisi of his eye condition. DRSAF ¶ 18. At the visit, Dr. Obaisi presumably had access to Mr. Long's medical records, which included Dr. Nista's July 2015 note identifying keratoconus as a possible diagnosis. *Id.* at ¶ 11. Dr. Obaisi then referred Mr. Long to an optometrist to evaluate his left eye. *Id.* at ¶ 18. These facts are sufficient for a reasonable jury to conclude that Dr. Obaisi at least "strongly suspected" that Mr. Long suffered from keratoconus or, more generally, a condition requiring treatment (indicating an objectively serious medical condition). *Conley*, 796 F.3d at 747; *see Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (describing a serious medical condition). Thus, Mr. Long has satisfied his burden to produce evidence suggesting that Dr. Obaisi was aware of a serious risk of harm.

The second prong of Mr. Long's burden is to produce sufficient evidence that Dr. Obaisi disregarded the risk of harm to Mr. Long. The Wexford defendants argue that Dr. Obaisi appropriately treated Mr. Long's eye condition by referring him to an optometrist. Wexford Defs.' Mem. Supp. Summ. J. 6-7; Wexford Defs.' Reply Br. 6. Mr. Long does not dispute the general premise that referring an inmate to a specialist is appropriate treatment, for good reason. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 462-63 (7th Cir. 2020) (affirming summary

judgment in favor of a doctor who referred an inmate with an eye issue to an eye specialist at the first opportunity); *Brown v. Adkins*, No. 22-2672, 2023 WL 6442920, at *3 (7th Cir. Oct. 3, 2023) (per curiam) (same). Rather, Mr. Long argues that Dr. Obaisi was deliberately indifferent because he "failed to refer or approve a referral to an optometrist for ten months, until December 2016." Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 10. The Court construes Mr. Long's argument for liability against Dr. Obaisi as follows: Dr. Obaisi must have known that a referral to an ***onsite*** optometrist would not secure Mr. Long treatment while Stateville lacked an onsite optometrist, so Dr. Obaisi should have referred Mr. Long to an ***offsite*** optometrist and approved that referral; Dr. Obaisi's failure to send Mr. Long offsite constituted deliberate indifference.

The Wexford defendants argue that Mr. Long has offered no evidence that the medical treatment he received was sufficiently inappropriate to overcome the high bar imposed by the professional judgment standard. Wexford Defs.' Mem. Supp. Summ. J. 4-7; Wexford Defs.' Reply Br. 4-6. Under this standard, "a successful plaintiff need not 'show that he was literally ignored' in his demands for medical treatment, and a defendant's showing that a plaintiff received '*some*' treatment does not resolve the issue conclusively if the treatment was 'blatantly inappropriate.'" *Roe*, 631 F.3d at 857-58 (quoting *Greeno*, 414 F.3d at 653-54). Summary judgment would be improper if "evidence exists that [Dr. Obaisi] knew better than to make the medical decisions that [he] did." *Petties*, 836 F.3d at 731. Medical personnel violate the constitution when they choose a "course of treatment that they know is ineffective." *Id.* at 730. "[P]rofessional judgment implies a choice of what the defendant believed to be the best course of treatment," so the choice of an ineffective treatment constitutes a decision not to exercise professional judgment. *Whiting*, 839 F.3d at 662 (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). In Mr. Long's case, an onsite referral for optometry care equated to no treatment during the period when Stateville lacked

an onsite optometrist. A jury does not need expert testimony to conclude that no treatment is ineffective treatment. Applying the above, the Court proceeds to ask whether evidence exists that Dr. Obaisi knew an onsite optometry referral was ineffective treatment for Mr. Long but still chose that treatment.

Evidence exists that Dr. Obaisi knew an onsite referral was ineffective treatment. When Dr. Obaisi referred Mr. Long for an onsite optometry appointment on February 16, 2016, Stateville already lacked an onsite optometrist; Dr. Nista stopped providing optometry care at Stateville on February 8, 2016. DRSAF ¶ 2. Wexford's difficulties staffing Stateville's optometrist position became obvious as the position remained vacant for months and a 500-inmate waitlist for optometry appointments developed. Even if Dr. Obaisi did not see Mr. Long for another visit after February 2016, a reasonable jury could infer that Dr. Obaisi, as Stateville's medical director, knew of Wexford's failure to staff an onsite optometrist and the growing waitlist for onsite care. From this evidence, the jury could find that Dr. Obaisi realized in February 2016, or at least at some time before Dr. Fahy began working as an optometrist at Stateville in October 2017, that onsite optometry referrals were inadequate to provide effective care.

Individual choice is core to personal liability. Thus, for Mr. Long to survive summary judgment, the evidence also must support a deliberate choice by Dr. Obaisi, *i.e.*, a decision among alternatives. *Cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 471 (1986) (holding that municipal liability attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible . . . with respect to the subject matter in question"). The Wexford defendants argue that Dr. Obaisi cannot be held liable for delays in Mr. Long's keratoconus care because he was not responsible for scheduling appointments. Wexford Defs.' Reply Br. 7; DRSAF ¶ 18. However, any dispute about Dr. Obaisi's responsibility for

scheduling is beside the point.[6] In this case, the relevant alternative is referring Mr. Long to an offsite optometrist and approving that referral. Whether Dr. Obaisi, as a nonoptometrist, had authority to refer patients to an offsite optometrist is wrapped up in the dispute between Mr. Long and the Wexford defendants regarding the content of Wexford's offsite care policy. As discussed in the Wexford section above, a reasonable jury could conclude that nonoptometrists at Stateville had authority to refer inmates to offsite optometrists. That jury could find that Dr. Obaisi had authority to refer Mr. Long to an offsite optometrist as a general practitioner and/or the medical director.[7] The parties do not dispute that Dr. Obaisi had authority to approve offsite optometry referrals in his role as the medical director (as distinct from his authority to make offsite optometry referrals, which is disputed). DRSAF ¶ 4. The parties agree that, as the medical director, Dr. Obaisi was responsible for "presenting and authorizing referrals [ ] for inmates to be seen by off-site medical providers during collegial reviews," and he directly approved at least two of Mr. Long's visits to offsite eye care providers in 2017 (after the delay period). *Id*. Thus, a reasonable jury could find that Dr. Obaisi had the choice to refer Mr. Long to an offsite optometrist and to approve that referral, though he did not select that alternative.

Two of Dr. Obaisi's decisions could constitute deliberate indifference. First, Dr. Obaisi's decision in February 2016 to refer Mr. Long to an onsite optometrist even in the absence of an onsite optometrist could support liability. Second, even if a jury found that Dr. Obaisi was not

---

[6] Elsewhere, the Wexford defendants explain that Mr. Long "was scheduled [to be seen by an optometrist or eye doctor] but due to hiring issues, [Mr. Long] was not actually seen by an optometrist or eye doctor for seventeen [sic] months." DRSAF ¶ 13. Because Mr. Long was scheduled for an appointment, it appears that Dr. Obaisi's responsibility (or lack thereof) for scheduling is irrelevant to the delay in Mr. Long's care.

[7] By contrast, if the jury found that Wexford had an explicit policy that required inmates to obtain offsite optometry referrals from an onsite optometrist (and no other type of medical care provider) to receive approval for an appointment with an offsite optometrist, then Dr. Obaisi could not be held liable for deliberate indifference based on his failure to refer Mr. Long offsite.

aware in February 2016 that an onsite referral was ineffective care, Dr. Obaisi's failure to change Mr. Long's course of care in the months that followed could constitute deliberate indifference. Persisting in a course of treatment known to be ineffective can raise a material fact issue of deliberate indifference. *See Greeno*, 414 F.3d at 655. A reasonable jury could conclude that Dr. Obaisi's inaction constituted acquiescence to Mr. Long's nonexistent keratoconus care. Viewing the evidence in the light most favorable to Mr. Long, Dr. Obaisi could reasonably be construed as having "walked away from the situation and left [Mr. Long] without medical care." *Arnett*, 658 F.3d at 759. Thus, a jury could reasonably conclude that Dr. Obaisi acted with deliberate indifference.

To summarize, Mr. Long has raised a triable issue of fact as to Dr. Obaisi's deliberate indifference. The Wexford defendants note the "attention and care" that Dr. Obaisi provided Mr. Long at Mr. Long's February 2016 visit. Wexford Defs.' Reply Br. 6. A jury is entitled to weigh this evidence against clues that Dr. Obaisi knew better than to provide the care that he did. The Court emphasizes that for a jury to find Dr. Obaisi personally liable, the jury must find that Dr. Obaisi had authority as a generalist practitioner and/or as the medical director to refer Mr. Long to an offsite optometrist and to approve that referral, which is the alternative care that Mr. Long argues he should have received.

### 3. Mr. Mills

Finally, Mr. Long names Mr. Mills, Stateville's former healthcare unit administrator, as an additional defendant. Mr. Long claims that Mr. Mills, like Dr. Obaisi, ignored Mr. Long's requests for medical care. The same standard applies: Mr. Long must provide evidence that Mr. Mills acted with a "sufficiently culpable state of mind" to support liability for deliberate indifference under

§ 1983, or with actual awareness of and disregard for a serious medical need. *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834).

The Court first considers Mr. Mills' knowledge of Mr. Long's medical need and delayed care. Mr. Long points to evidence that his eye condition was visible to the naked eye and that he sent letters to Mr. Mills, filed a grievance on December 20, 2016, and spoke with Mr. Mills about his symptoms and delayed treatment. DRSAF ¶¶ 16-17, 19. Mr. Mills denies receiving any letters from Mr. Long or reviewing or responding to Mr. Long's December 2016 grievance, but he admits that he had a conversation with Mr. Long during which Mr. Long requested an offsite optometry appointment. *Id.* at ¶¶ 16-17. Courts have found that the plaintiff provided sufficient evidence of knowledge "when, in addition to submitting grievances, there was evidence that the plaintiff spoke in person with or wrote letters to the official." *Gevas v. Obaisi*, No. 16-CV-10599, 2022 WL 17082526, at *3 (N.D. Ill. Nov. 18, 2022) (collecting cases). The evidence as to Mr. Mills falls short of the evidence provided by plaintiffs in these other cases. Importantly, Mr. Long filed no pertinent grievance. Mr. Long filed one grievance during the period when he alleges a constitutional violation (July 2015 to December 2016), and he filed this grievance at the end of the period, only eight days before his first visit with Dr. Fahy. Thus, even if Mr. Mills read Mr. Long's grievance,[8] the grievance would not have alerted Mr. Mills to Mr. Long's medical need during the relevant period. Furthermore, Mr. Long only provided evidence of one letter sent to Mr. Mills and one conversation with Mr. Mills during the relevant period. The letter in evidence does not describe

---

[8] Courts have found that prison officials cannot insulate themselves from personal involvement in the deprivation of medical care by delegating grievance review. *See Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 992 (N.D. Ill. 2012) ("The court does not believe that McCann can use the fact that he delegated much of the review of medical grievances to administrative assistants to insulate himself from liability."); *Thomas v. Wexford Health Servs., Inc.*, 414 F. Supp. 3d 1154, 1163 (N.D. Ill. 2019) (relying on *Flournoy*). Persuaded by the reasoning in these cases, this Court assumes that Mr. Mills read Mr. Long's grievance.

Mr. Long' symptoms, and Mr. Mills has raised serious questions about the authentication of the letter.[9] A jury could not reasonably infer from the limited evidence produced by Mr. Long that Mr. Mills knew of Mr. Long's serious medical need during the relevant period.

Even if Mr. Mills knew of Mr. Long's serious medical need, Mr. Long must show that Mr. Mills disregarded that need. Mr. Long argues that Mr. Mills was deliberately indifferent because he should have "help[ed]" to secure an optometry appointment for Mr. Long or "at least advocate[d]" for Mr. Long. Pl.'s Resp. Opp. to Defs.' Mots. Summ. J. 16. Mr. Mills, for his part, argues that he cannot be held personally responsible for the delay in Mr. Long's care because he "was neither responsible for filling the optometrist position at Stateville, nor able to send [Mr. Long] to an off-site optometrist without a recommendation from an on-site optometrist." Def. Mills' Reply Br. 3.

An "official satisfies the personal responsibility requirement of [§] 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent." *Arnett*, 658 F.3d at 757 (quoting *Gentry*, 65 F.3d at 561). Here, the relevant conduct is Wexford's offsite care policy. There is no dispute between Mr. Mills and Mr. Long that Wexford maintained a policy of refusing offsite eye care visits to inmates unless those inmates received a referral from an onsite optometrist.[10] Had Mr. Mills set Wexford's offsite care policy, he could be held personally responsible for constitutional deprivations caused by the policy, but Mr. Long has

---

[9] Mr. Mills points out that the letters Mr. Long attached to his *pro se* complaint (the only letters Mr. Long claims to have sent) do not list a mailing address. PRMSF ¶ 31. In addition, Mr. Mills states that Stateville has no record of the letters, although the parties dispute the admissibility of the declaration that supports this statement of fact. *Id*. at ¶ 32. The Court does not decide the evidentiary dispute because this dispute does not affect the Court's conclusion about the sufficiency of the evidence produced by Mr. Long on the issue of knowledge.

[10] Mr. Long admitted to Mr. Mills' statement of fact that "Stateville Correctional Center only sends inmates to be seen by off-site optometrists if the on-site optometrist makes a recommendation for specific inmates to receive off-site treatment or assessment." PRMSF ¶ 22.

offered no evidence that Mr. Mills (an IDOC employee) had any role in devising or implementing Wexford's policy. *Compare Roe*, 631 F.3d at 862 (denying judgment as a matter of law to an IDOC medical director who set the IDOC policy that resulted in a denial of treatment to the plaintiff). Furthermore, Mr. Long does not allege that Mr. Mills, as the healthcare unit administrator at a single Illinois prison, was responsible for overseeing Wexford's hiring practices or offsite care policy. Based on the record evidence, a reasonable jury could not find that by failing to intervene, Mr. Mills condoned Wexford's policy. As a result, Mr. Long has failed to raise a question of fact as to whether Mr. Mills directed or condoned the relevant conduct. The evidence does not show any viable path to holding Mr. Mills responsible for disregarding Mr. Long's keratoconus.

Mr. Long has not raised a question of fact as to whether Mr. Mills acted with deliberate indifference. The Court therefore grants Mr. Mills' motion for summary judgment.

### C. Punitive Damages

The Wexford defendants contend that should the Court deny their motion for summary judgment as to the merits of Mr. Long's claims, the Court should nonetheless find that punitive damages are not warranted as a matter of law. The Wexford defendants identify two reasons why the Court should grant summary judgment as to the propriety of punitive damages: first, because Mr. Long has not provided evidence of Dr. Obaisi's "evil motive or intent," and second, because Dr. Obaisi is deceased. Wexford Defs.' Mem. Supp. Summ. J. 14-15.

A jury may award punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Where, as here, the plaintiff raises a genuine dispute as to whether the defendants acted with deliberate indifference, the plaintiff also raises a

genuine dispute as to whether the jury could find that the defendants were sufficiently reckless or callous to justify punitive damages. *See Woodward*, 368 F.3d at 930 (explaining that the standard for punitive damages in § 1983 actions "is the same standard as for § 1983 liability" in deliberate indifference claims). Therefore, to the extent that the Wexford defendants seek summary judgment on Wexford's behalf as to punitive damages, their request is denied.

As to Dr. Obaisi, the Court also considers the effect of his death on whether punitive damages are warranted. The Wexford defendants argue that because the purposes of punitive damages are to "punish blameworthy behavior and deter defendants from committing future bad acts," *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018), imposing punitive damages on a deceased defendant would not serve a valid purpose. Mr. Long responds that there are two types of deterrence, specific deterrence and general deterrence, and that punitive damages against Dr. Obaisi would still serve the purpose of general deterrence. As Mr. Long points out, the Seventh Circuit has affirmed punitive damages awards against deceased defendants. *See, e.g., Javier v. City of Milwaukee*, No. 7-CV-204, 2009 WL 10663364, at *8-9 (E.D. Wis. Dec. 23, 2009), *aff'd in relevant part by Javier v. City of Milwaukee*, 670 F.3d 823, 828 n.3 (7th Cir. 2012). In *Javier*, however, the Seventh Circuit merely reported that a jury had awarded punitive damages against the defendant, who was deceased; it was not presented with, and did not address, the propriety of awarding punitive damages against a deceased defendant. In the absence of binding precedent to the contrary, in deliberate indifference cases involving multiple defendants, courts have also reasoned that insufficient purpose is served to justify punitive damages against a deceased defendant, specifically Dr. Obaisi. *See, e.g., Morris v. Obaisi*, No. 17-CV-5939, 2023 WL 2745508, at *8-9 (N.D. Ill. Mar. 31, 2023); *Taylor v. Wexford Health Sources, Inc.*, No. 16-

CV-3464, 2022 WL 4329025, at *13-14 (N.D. Ill. Sept. 19, 2022); *Flournoy v. Estate of Obaisi*, No. 17-CV-7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020).

This Court is persuaded by the court's reasoning in *Morris*. While punitive damages may sometimes be warranted against a decedent's estate, they are not in this case. Wexford remains a defendant along with Dr. Obaisi. Should a jury find Dr. Obaisi liable for deliberate indifference, that jury could also find Wexford liable for condoning Dr. Obaisi's conduct. Alternatively, a jury could find Wexford directly liable for an unconstitutional policy or custom without finding Dr. Obaisi liable. Therefore, along any of Mr. Long's paths to a successful deliberate indifference claim, the function of general deterrence can be achieved, if warranted, by awarding punitive damages against Wexford. Conversely, awarding punitive damages against Dr. Obaisi would no longer serve the purposes of providing specific deterrence or punishment. Accordingly, the Wexford defendants' motion for summary judgment on punitive damages is granted as to Dr. Obaisi and denied as to Wexford.

\* \* \*

For the reasons stated above, the Wexford defendants' motion for summary judgment is granted in part and denied in part, while Mr. Mills' motion for summary judgment is granted. The Wexford defendants' motion is granted as to Mr. Long's request for punitive damages against Dr. Obaisi's estate. The Wexford defendants' motion is otherwise denied.

Date: March 26, 2024

John J. Tharp, Jr.
United States District Judge